HANIFEN v. LUPTON et al.

(Circuit Court, E. D. Pennsylvania. June 19, 1899.)

No. 9.

1. PATENTS—CONSTRUCTION OF LICENSE.

A licensee was authorized to "deal in, import, use, and sell the knitted fabric" covered by the patent, at a royalty of two cents per yard; and the licensee covenanted not to handle or deal in any goods like those covered by the patent which were made in this country by any party "not licensed under the above-mentioned patent, unless he pays the royalty thereon himself, it being understood, however, that but one royalty shall be paid in such goods, or any fabric coming under this license, whether paid by manufacturer or seller." *Held* that, while this provision created no privity between the licensor and any third person who might make such goods in this country and sell them through the licensee, yet, if the licensee paid the royalty on such goods, this was a waiver of the monopoly as to them, so that the licensor could not sue the manufacturers for infringement.

2. SAME—ANNULMENT OF LICENSE—BREACH OF COVENANT.

The mere breach of a covenant by the licensee does not ipso facto annul a license. There must be some proper proceeding and a rescission in equity.

Fraley & Paul and W. P. Preble, Jr., for complainant.

A. B. Stoughton, for respondents.

GRAY, Circuit Judge. This is a suit for infringement of letters patent No. 374,888, granted to the complainant, under date of December 13, 1887, for improvements in knitted fabrics. The patent has

95 F.—30

been sustained by the United States circuit court of appeals of this circuit in the case of Hanifen v. E. H. Godshalk Co. (No. 19; Sept. Term, 1897) 55 U. S. App. 464, 28 C. C. A. 507, and 84 Fed. 649.

The bill of complaint was filed March 24, 1898, and the answer, filed June 20, 1898, was practically a copy of the answer filed in the Godshalk Case, no new defenses being adduced. These defenses were the usual ones, denying infringement, assertion of the invalidity of the patent on the ground of anticipation, want of novelty, etc. The case was brought to issue July 5, 1898. Complainant made the usual prima facie proof, and rested, July 25, 1898. Before any evidence was taken in behalf of the defendants, and after the case was set down by complainant for final hearing, the counsel for defendants, on February 8, 1899, obtained leave to file an amended answer, setting forth an alleged license to one Jean Bry for the sale of the patented fabric, and averring that all of the goods made by defendants, and herein complained of, were sold through said Bry, and that the royalty provided by such license, with the exception of a small balance, had been paid. At the hearing, the validity of the patent was admitted by the defendants, and also the fact that they had made goods which come within its terms as construed by the circuit court of appeals for this circuit. The defendants rely alone upon their claim that they are protected in their doings by the said license to Jean Bry. This license reads as follows:

"Memorandum of agreement made and concluded this twenty-sixth day of May, 1897, by and between John E. Hanifen & Co., of Philadelphia, party of the first part, and Jean Bry, of 20 Greene street, New York City, party of the second part: (1) Said John E. Hanifen & Co., in consideration of the faithful performance and discharge by the said party of the second part of the agreements hereinafter set forth by him to be performed, hereby license and empower said Jean Bry to deal in, import, use, and sell the knitted fabric described and claimed in the second claim of letters patent of the United States No. 374,888, issued December 13, 1887, to Levi Bywater, assignor to said John E. Hanifen & Co., at a royalty of two cents per yard. (2) Said party of the second part hereby accepts said license, and agrees, in consideration of the granting thereof, to make monthly returns, in writing, to W. P. Preble, Jr., attorney for said John E. Hanifen & Co., within the first ten days of each and every month, of all such knitted fabrics imported or sold by him during the previous month, and to pay the above-mentioned royalty thereon at the time of said returns; and also covenants and agrees not to handle, deal in, take orders for, or serve as commission agent for, any goods of this description made in this country by any person, firm, or corporation who is not licensed under the above-mentioned patent, unless he pays the royalty thereon himself, —it being understood, however, that but one royalty shall be paid on such goods, or any fabric coming under this license, whether paid by manufacturer or seller. (3) This license shall last, unless sooner terminated, until the expiration of the above-mentioned patent, and shall take effect from the 15th day of March, 1897, and apply to all goods ordered after such date, and shall only be terminated by mutual consent or for failure on the part of the said parties of the second part to make proper returns and payments; but either party may terminate this license on one year's notice, not to be given, however, before November 1, 1897. (4) Said party of the second part further covenants and agrees, when called upon, to satisfy said Preble, and furnish such data as may be necessary to verify the accuracy of said monthly reports. (5) It is further mutually agreed that the suit now pending against H. A. Caesar & Co. shall be disposed of without costs to either party, and by such entry or order as the parties may hereafter agree would be for the best inter-

ests of the parties hereto.  In witness whereof the parties hereto have hereunto set their hands and seals this 26th day of May, 1897.

"[Signed]                                    John E. Hanifen & Co."

It will be observed, from the reading of this license, that the defendants, Lupton & Co., were not manufacturing under any express license from the complainant.   Jean Bry was the licensee, and the Luptons are the defendants, not Bry.   Unquestionably, Lupton & Co., in manufacturing goods covered by the patent, were infringers of the patent monopoly, unless they can bring themselves under the protection of the license to Jean Bry, as set forth in their amended answer.   No question is made as to the validity of the patent, the sole question being, has the patent monopoly—that is, the right to sue for an infringement—been waived by the patentee in this case? The defendants say that it has been waived by reason of the covenant in the second paragraph of the instrument of writing granting the license to Bry.

The covenant is a peculiar one, and no case has been cited on either side of a license with just such a feature as this.   On the one hand, it would seem intended to restrain the licensee (Bry) from dealing in or handling the goods made by unlicensed domestic manufacturers, and thus measurably to protect the patentee from the unlawful inroads upon his monopoly by such persons, and to preserve his property rights from invasion.   The language of this covenant, down to the word "unless," is appropriate to the purpose above described, and is usual and natural.   On the other hand, the clause commencing with the word "unless" would seem intended to mean more than a mere exemption of the licensee from the consequences of dealing in or using goods made in infringement of the patent monopoly, by allowing him to pay the royalty himself, and thus condoning the offense. It rather seems to invite such dealing, for the purpose of securing the royalty that was ordinarily charged to manufacturers.

The carefully inserted provision, "that but one royalty shall be paid on such goods, or any fabric coming under this license, whether paid by manufacturer or seller," points strongly to the conclusion that the complainant expected Bry to deal with such manufacturers as Lupton & Co.   And the testimony of Mr. Preble, the complainant's attorney in fact, in stating what passed between him and Mr. Wetmore, counsel for the licensees, in the drafting of the license, coincides with this view.   On pages 8 and 9 of complainant's record, Mr. Preble testifies as follows:

"At a subsequent interview, Mr. Wetmore suggested, as a sort of possibility which ought to be taken care of, that perhaps some domestic manufacturers, who had stood out against the patent, might prefer to have their commission house nominally pay the royalty to paying it themselves, and asked me if I had any objections to adding the clause which now appears in the license, 'unless he pays the royalty thereon himself.' I told him I had not. Later on, in getting the license into permanent shape, Mr. Wetmore asked me if I expected to collect our royalty from the manufacturer if the commission house had already paid it, and I told him certainly we did not.  Thereupon, at his suggestion, the words. 'it being understood, however, that but one royalty shall be paid on such goods, or any fabric coming under this license, whether paid by manufacturer or seller,' were added.  Those words were put in to make it perfectly plain that, if the royalty on the domestic goods was properly paid,

it was matter of indifference to us whether the payment was made in the name of the manufacturer or the commission house."

As I have said, the covenant of the licensee. (Bry) is a peculiar one, and presumably unusual, but it should be taken to intend what must inevitably result from it. It is a restrictive covenant, with an exception, the inevitable effect of the whole being a permission or license to Bry (and the other licensees) to "handle, deal in, take orders for, and serve as commission agent for, any goods of this description made in this country" by any unlicensed person, firm, or corporation, provided he (the licensee) pays the royalty thereon himself. It is true, this license was granted to Bry, and it was also granted to others in precisely identical terms, and it was not made to Lupton & Co. Inasmuch, however, as the intent and necessary effect of the grant to Bry was permission to him to deal in, handle, and act as agent for goods manufactured by Lupton, or any other unlicensed manufacturer, on the payment by Bry of the royalty thereon, Lupton & Co. cannot, in respect to goods so manufactured and handled by Bry, be considered, in law or in morals, as an infringer of the complainant's patent. As to them and others in like situation, the patent monopoly is waived. It is true that the patentee had no contract with them, and they are not privy to the contract with Bry or the other licensees. But this does not justify the statement made by the complainant's counsel, in his brief, that the "defendants' contention rests upon the proposition that a tort feasor can escape the consequences of his trespass by effect of a contract to which he was neither party nor privy." In respect to these transactions with Bry, as well as those with Victor & Achelis, defendants are not tort feasors. The complainant's contract with Bry, as with the other licensees, was that he might deal, in a mode prescribed, in goods made by unlicensed manufacturers, such licensees contracting to pay the royalty thereon.

Whether we call this an estoppel upon the licensor to treat as an infringer the manufacturers with whom Bry and the other licensees dealt in accordance with the terms of their license, or an implication of license to such manufacturers to make and sell their product for and through Bry and the other licensees, is not important, because the effect of it all is that, as to the goods thus dealt in, the patent monopoly was waived. In the ordinary case of a license by a patentee to another to sell the patented article, the licensor will not be permitted to claim that the use of such article by the purchaser from such licensee is an infringement of his monopoly. In this case, as in the one before the court, though there is no express license to such purchaser, there is no difficulty in finding ground upon which to place the protection which the law undoubtedly gives. The morality which must obtain in the conduct of human affairs demands that such protection be accorded, and it is upon high ethical ground that the doctrine of estoppel, as well as license by implication, is founded.

The complainant, having authorized such dealings as those which the defendants allege took place between Bry and Lupton, must look to Bry for the performance of his part of the contract, by the payment of the stipulated royalty, as it is conceded that Lupton cannot

be regarded as a privy to this contract. On this line, the position here taken in regard to the effect of the license to Bry, upon his transactions with the defendants, is strengthened by the conduct of complainant, as disclosed by the evidence. The letter written by William P. Preble, attorney in fact of complainant, under date of December 6, 1898, to Jean Bry, though written after the inception of this suit, throws much light upon the attitude of the parties from the beginning. This letter is defendants' Exhibit 9, on pages 24, 25, and 26 of defendants' brief, and I quote at some length, because it is plain, from the last paragraph of the letter, that in the first paragraph quoted the writer is referring to unlicensed manufacturers, such as the Luptons:

"Remember, also, that if you have included in your returns any domestic goods, the royalty of two cents per yard which you have paid thereon only frees you from further payment. There is still due to us from the manufacturer of those goods one cent a yard on goods which sold at less than a dollar and a half per yard, and three cents a yard on goods selling over that figure. The only royalty rate which we recognize on domestic goods is three and five cents: and the permission granted in your special license to pay the royalty at two cents a yard on all goods which you sold was only a personal privilege to the nine of you who took licenses in May, 1897, to save you trouble, but not to allow manufacturers to obtain a reduced rate of royalty. I call your attention to this matter because, while I have no direct evidence that any of the goods which you have accounted for were domestic goods, I have received through Mr. Fraley, of Philadelphia, who had it from Mr. Stoughton, who had it from Mr. Lupton, a copy of the receipt which I gave you on October 8, 1898; Mr. Stoughton claiming that Lupton's goods were now being sold under a license. If the 21,500 covered by that receipt were Lupton's domestic goods, there is still owing to us on that account the sum of $215: and, if the 2,998 yards covered by the check received this morning are also Mr. Lupton's goods, there would be $29.98 still owing to us on those goods. This makes $244.98. I see no objection to receiving this amount through you, instead of from Mr. Lupton direct, if he prefers it that way."

Surely, the statement that, "if Bry has included domestic goods in his returns, there must be paid a further sum, as for a manufacturer's royalty," is a recognition of dealings such as the defendants claim theirs to have been with Bry, in regard to this patented article. With this admitted knowledge of the fact that Bry was dealing in Lupton's goods, the writer asks for an additional payment on them, and sees "no objection to receiving this amount through you [Bry] instead of from Mr. Lupton direct." No protest is made against Bry's dealing in Lupton's goods. On the contrary, he merely asks for more money, and the question between them resolves itself into a dispute as to the amount of royalty due. This dispute is one to be settled with Bry, upon a proper interpretation of the contract of license, but not in this suit or tribunal.

Of some significance, also, in this connection, are the facts appearing by the stipulation of counsel in regard to the license to Victor & Achelis. The stipulation is as follows:

"Hanifen v. Lupton & Co.    U. S. C. C., April Sessions, 1898.

"Philadelphia, February 27, 1899.

"It is hereby stipulated and agreed between counsel for complainant and counsel for defendants that the firm of Victor & Achelis, of New York City, have a license which is still in force, which license is, with the exception of

the name of the licensee, identical in terms with the license offered in this case, granted to Jean Bry; and, further, that Thomas F. Shaw, if called as a witness on behalf of the defendants, would testify that he is connected with said firm of Victor & Achelis, and that said firm have been the sole sales agents since the termination of their dealings with Mr. Jean Bry, and that said firm has agreed with defendants to be their exclusive agents, during the coming year, for the sale of the entire output of the mill of defendants, in so far as it consists of the goods complained of in this case, and that the defendants have authorized the said firm to pay the royalty at the rate of two cents per yard on the goods coming under the patent."

The questions here are—First, whether, as to dealings by defendants with Bry in goods manufactured by them under the patent, there was a waiver of the patent monopoly; and, second, if so, whether it appears from the evidence in the cause that all the goods manufactured by defendants, and complained of, were sold through the said licensee, Bry, or Victor & Achelis. It is contended by complainant's counsel that Bry's license is annulled by virtue of the clause in the license providing that the same shall be terminated for failure of parties of the second part to make proper returns and payments. It is true that written notice to this effect was served on Bry December 16, 1898. But a mere breach of covenant (if such breach were established) does not, ipso facto, annul a license. There must be some proper proceeding and a rescission in equity. There was, then, no annulment or forfeiture of the Bry license that would make it inoperative for the protection of the licensee's dealings with the defendants, in accordance with its terms, and it is not even claimed that the license to Victor & Achelis is not still in force. To the first question, then, it must be answered that there was, as to goods manufactured by the defendants and dealt in by Bry or Victor & Achelis, a waiver of the monopoly of the patent.

The meagerness of the record makes it somewhat difficult to answer the second question satisfactorily. It is true that the special defense set up by the defendants, that they acted under the permission contained in the Bry and other licenses, and that goods which would prima facie be infringements were thereby protected, is an affirmative defense, and throws the burden of proving it upon the defendants. The evidence disclosed in the record on this point is not as clear as could be desired, but at the same time, in the absence of contradiction, it is prima facie sufficient. Bry swears that all the goods made by Lupton & Co. were sold through him, and although the defendants do not testify, and no explanation is offered for their silence, the testimony of Bry, in connection with the sworn statement of the amended answer, must be considered as sufficient to sustain the burden of proof until it is rebutted by evidence on the other side. None such has been adduced, nor is it disputed that the facts stipulated by the parties, as constituting the testimony in regard to the dealings with Victor & Achelis, are true. If there is a dispute as to the amount of the royalty to be paid by Bry and the other licensees in such cases as this, it can, as I have already said, be determined by a proper proceeding under the contract of license, or, if it is claimed that the licenses have been forfeited by failure to make proper returns, the same can be rescinded by proper proceedings in equity.

In view of the case thus taken, I am of the opinion that the bill should be dismissed.